### UNITED STATES v. MITCHELL et al.

(Circuit Court, D. Oregon. September 11, 1905.)

Nos. 2,890, 2,898.

CONSPIRACY—FEDERAL STATUTE—SUFFICIENCY OF INDICTMENT.

An indictment under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], which charges that . defendants knowingly, unlawfully, wickedly, and corruptly conspired to defraud the United States out of its title to certain public lands by means of false, fraudulent, and fictitious entries of the same under the land laws, and that in pursuance of, and to effect the object of, such conspiracy, certain acts set forth were committed by one or more of the defendants, is not insufficient, because it does not expressly aver that such acts were done with knowledge of the fraudulent and illegal character of the entries. The essence of the offense is the conspiracy, and while an overt act is an essential element under the statute, the use of the word "knowingly" in charging the conspiracy must fairly be held to apply to and characterize the acts specifically charged to have been done in furtherance of such conspiracy, and for the purpose of carrying it into effect.

Indictment for conspiracy, under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676]. On demurrer

See 136 Fed. 896.

Francis J. Heney, for the United States.

John M. Gearin, for defendant Binger Hermann.

HUNT, District Judge. It is charged that on February 1, 1902, defendants conspired and agreed together, knowingly, wickedly, and corruptly to defraud the United States out of the possession and use of, and the title to, divers large tracts of the public lands within Oregon, which lands had been, prior to September 28, 1893, open to entry under the homestead laws, but which were on that day included within the limits of the Cascade Range Forest Reserve by executive order, and withdrawn from settlement and entry, under the laws pertaining to forest reserves. It is alleged that the said unlawful conspiracy to defraud the United States was one for obtaining, for the profit and benefit of defendants, and appropriating the possession and use of, and title to, and the proceeds of the sale of, the lands, as set forth, by means and in pursuance of a certain false, fraudulent, and corrupt practice of them, the said defendants—

"Whereby, relying upon the fact that the said Binger Hermann, as, and who then was, Commissioner of the General Land Office of the said United States, had the power to recommend and secure the issuance of patents conveying title in such lands from the said United States to entrymen under the said homestead laws, in cases where the records of the said land office and General Land Office showed that homestead entries had been made upon the same prior to the day last aforesaid, and that the persons appearing to have made such entries had continued to reside upon and cultivate such

lands, notwithstanding such entries might be false and fraudulent, and rely-
ing also upon the fact that titles so obtained under such patents could be
sold to persons who might want to relinquish the same to the said United
States, as was and is allowed by law, in exchange for better lands, lying out-
side of the limits of the said forest reserve, they, the said John H. Mitchell,
Binger Hermann, Stephen A. D. Puter, Horace G. McKinley, Emma L.
Watson, Dan W. Tarpley, Elbert K. Brown, Mrs. Nellie Brown, Henry A.
Young, Frank H. Walgamot, Clark. E. Loomis, and Salmon B. Ormsby, were
to take advantage of the fact that there had been made and had been filed in
the land office of the said United States at Oregon City, aforesaid, divers
false and fraudulent applications and affidavits in writing for the entry
of the said lands under the said homestead laws as and for applications and
affidavits of bona fide settlers upon the said lands, and divers false and
fraudulent affidavits as and for affidavits of final proof of the settlement of
such persons upon the said lands at a time prior to their said inclusion with-
in the limits of the said forest reserve and to their said withdrawal from
entry, and of residence by such settlers upon, and their cultivation of, the
same lands, in pursuance of and subsequent to such settlement, as is required
by the said homestead laws—false and fraudulent, in this: that some of
such applications and affidavits were made in and under assumed names of
persons executing the same or causing the same to be executed, and none of
such applications and affidavits was made by a person who had in fact
settled upon the said lands prior to their said inclusion within the limits
of the said forest reserve and to their said withdrawal from entry, or who
had at any time resided upon, or in any manner cultivated or improved, the
said lands, and were, directly, or through intermediate conveyances, to ac-
quire such titles from the said United States in the name of the said Emma
L. Watson, and, by and through her, to sell and dispose of the same so that
they would finally become the property of persons who would have no knowl-
edge of the fact that they were so unlawfully and fraudulently obtained
from the said United States. * * * That, in pursuance of the said un-
lawful conspiracy, combination, confederation, and agreement, and to effect
the object of the same, and by means thereof to defraud the said United
States out of the possession and use of and title to a certain tract of the
said public lands, that is to say, the northeast quarter of section thirty-two in
the said township and range, containing one hundred and sixty acres of
land, to enter and obtain title to which said tract an application and affida-
vits of the kinds aforesaid, respectively false and fraudulent in the particu-
lars aforesaid, had, before the day in this indictment first aforesaid been
filed in the said land office at Oregon City in the name of Emma Porter, that
being an assumed name of the said Emma L. Watson. The said Salmon B.
Ormsby afterwards, to wit, on the fourth day of February, in the same year
nineteen hundred and two, at the city of Salem, in the said district of
Oregon, unlawfully did make and execute a certain jurat, to wit, a jurat
of the tenor following:

" 'Subscribed and sworn to before me this 4th day of February, 1902, S. B.
Ormsby, Forest Superintendent,' upon and to a certain deposition of one L.
Jacobs concerning the supposed settlement and residence upon the same
lands by Emma Porter."

Other overt acts are alleged, of a similar nature to that just de-
scribed.

It is also alleged that, in pursuance of the said unlawful conspiracy and
agreement, and to effect the object of the same, and by means thereof
to defraud the United States out of the possession and use of and title to
all of the tracts of public lands described in the indictment, the said
John H. Mitchell, on March 3, 1902, at the city of Washington, unlaw-
fully did prepare a certain written affidavit for the said Emma L. Wat-
son to sign and swear to. This affidavit, made by Mrs. Emma L. Wat-
son, substantially states that she owned by purchase certain described

lands; that she paid in the aggregate for them a little over $8,000; that when she bought she was advised that the titles were good, except that patents had not issued, but would be issued at a very early date, in the regular course of business; that, in order to raise money to purchase the lands, she had borrowed a large sum of money, and that she would suffer great injury unless her rights could be determined by the Interior Department at Washington; that all of the lands bought were homestead entries, and that she believed they were all made without fraud or other cause which would stand in the way of the issuance to the entrymen of patents to the lands—wherefore she asked speedy examination and action. The indictment contains another affidavit, made by defendant Puter, wherein he states that he was the representative of Mrs. Watson in investing her money, and that he advised her to buy the lands, and assured her that the titles were good, except that patents had not issued, and that he was put in an embarrassing position, as there was some delay, and certain attacks were made on a portion of the entries described, and that it was a matter of much importance to Mrs. Watson and himself that there be a speedy determination of the homestead entries. It is charged that on March 3, 1902, at Washington, D. C., defendant Puter did pay to John H. Mitchell the sum of $2,000 in furtherance of the conspiracy and to effect the object thereof; also that said John H. Mitchell afterwards, on March 10, 1902, at Washington, did introduce defendant Puter to one William A. Richards, who was then an assistant commissioner of the General Land Office, and then and there did commend the said Puter to the said Richards as one of the most reliable citizens of the state of Oregon. It is also averred that, in pursuance of the unlawful conspiracy and agreement, and to effect the object of the same, the defendant Emma L. Watson, on May 5, 1902, did execute a deed to one Frederick A. Kribs covering all of the tracts of land described in the indictment.

The point urged is that a scienter is not alleged, in that it is not charged that these defendants knew that the lands entered were falsely and fraudulently entered. The indictment is for conspiracy to defraud the United States, as denounced in section 5440, Rev. St. [U. S. Comp. St. 1901, p. 3676]. The essence of the offense charged is the conspiracy, although the statute requires not only a conspiracy, but the doing of some act to effect its object; such act being one of the means by which the conspiracy is sought to be carried into effect. Now the charge here is that defendants unlawfully conspired, knowingly, wickedly, and corruptly to defraud the United States out of title to certain lands, with an object and by certain means, that is, by certain acts by which the conspiracy was to be carried into effect. To have conspired knowingly, unlawfully, wickedly, and corruptly to acquire the lands described is a complete offense of conspiracy if any act was done to carry into effect the object of such conspiracy. Without the doing of the act to carry out the object of the conspiracy, there would be no crime; yet we must not lose sight of the fact that, while the doing of the act is essential, it is nevertheless but a means by which the conspiracy is sought to be made effective.

As I understand the reasoning and decision of the Supreme Court in

Dealy v. United States, 152 U. S. 542, 14 Sup. Ct. 680, 38 L. Ed. 545, it is that in an indictment for conspiracy to defraud in cases involving entries of public lands under section 5440, it is only necessary to allege that defendants did falsely, unlawfully, and wickedly conspire, combine, confederate, and agree together to defraud the United States of the title and possession of large tracts of public lands by means of false, feigned, illegal, and fictitious entries of the lands under the homestead laws (the lands being public lands, and open to entry under the homestead laws at the proper local land office) ; and that, according to and in pursuance of the conspiracy so charged, the defendants have done an act to carry into effect the object. It is true that in the indictment discussed in the Dealy Case it was alleged that the overt act done was the persuading of a person to make a filing and proof on certain lands upon which such person, as defendants well knew, had never made settlement, improvement, or residence; but, the indictment having previously charged that defendants unlawfully, falsely, and wickedly conspired, I do not believe the court regarded the particular use of the words alleging knowledge as essential to the portion of the pleading which averred particular facts connected solely with the doing of the overt act, which was but a means by which the conspiracy was sought to be carried into effect.

In the indictment under examination, we find that it is distinctly charged that defendants knowingly, wickedly, and corruptly conspired to defraud the United States out of title to certain public lands. Overt acts or means are then set forth. The language of the charge excludes the idea of any unintentional wrong, and the word "knowingly" as used may fairly be regarded as qualifying the acts subsequently stated, including the doing of those by which the conspiracy was to be carried into effect. Analogies are to be found in the opinions of the Supreme Court of the United States. In Dunbar v. United States, 156 U. S. 186, 15 Sup. Ct. 325, 39 L. Ed. 390, indictments were presented charging defendant with the crime of smuggling, under section 2865, Rev. St. [U. S. Comp. St. 1901, p. 1905]. The statute provides as follows:

"If any person shall knowingly and willfully, with intent to defraud the revenues of the United States, smuggle or clandestinely introduce into the United States any goods, wares or merchandise, subject to duty by law, and which should have been invoiced, without paying or accounting for the duty * * * every such person * * * shall be deemed guilty," etc.

The charge in one of the counts of one of the indictments was that the defendant willfully, unlawfully, and knowingly, and with intent to defraud the revenues of the United States, did smuggle and clandestinely introduce into the United States certain goods, wares, and merchandise, describing them, and which should have been invoiced, without paying or accounting for the duty, or any part thereof.

Another section of the statute (section 3082 [U. S. Comp. St. 1901, p. 2014]) provides:

"If any person shall fraudulently or knowingly import into the United States, or assist in so doing, any merchandise contrary to law, or shall receive, or in any manner facilitate the transportation, or concealment or sale of such merchandise after importation, knowing the same to have been imported contrary to law, such merchandise shall be forfeited, and the offender shall be fined," etc.

The substance of certain counts of the second indictment was that the defendant did willfully, unlawfully, and knowingly, and with intent to defraud the revenues of the United States, smuggle and clandestinely introduce into the United States certain amounts of prepared opium.

The ninth count of the second indictment in the Dunbar Case charged that on the 5th day of February, 1893, the defendant did willfully, unlawfully, fraudulently, and knowingly, and with intent to defraud the revenues of the United States, facilitate the transportation, after importation, of a large quantity of prepared opium, which was subject to a duty by law, and which should have been invoiced, and which prepared opium, on said 5th day of February, 1893, had been knowingly, willfully, unlawfully, and fraudulently brought, imported, smuggled, and clandestinely introduced into the United States, and upon which no duty had been paid or accounted for according to law, and that none of said prepared opium had been invoiced; the defendant then and there well knowing that no duty had been paid or accounted for according to law on said opium, and that none of said opium had been invoiced, and that the same, and the whole thereof, had been unlawfully, willfully, knowingly, and fraudulently brought, imported, smuggled, and clandestinely introduced into the United States. It was there alleged that all the counts except the ninth were bad, because a scienter was not alleged. No objection was made to the ninth count, because it was conceded that it averred a knowledge of the fact that the opium had been imported into the United States; but in the other counts such knowledge was not directly averred in language similar to that used in the ninth count.

The Supreme Court, by Justice Brewer, stated that the indictment had been carefully examined, and that none of the criticisms which were based upon a lack of allegation of knowledge were well taken:

"They charge that the defendant did 'willfully, unlawfully, and knowingly, and with intent to defraud the revenues of the United States, smuggle and clandestinely introduce into the United States,' the prepared opium. It is stated in 1 Bish. Crim. Proc. (3d Ed.) § 504, that the words 'knowingly' or 'well knowing' will supply the place of a positive averment that the defendant knew the fact subsequently stated; and to like effect are the authorities generally. The language of the indictment quoted excludes the idea of any unintentional and ignorant bringing into the country of prepared opium upon which the duty had not been paid, and is satisfied only by proof that such bringing in was done intentionally, knowingly, and with intent to defraud the revenues of the United States. Indeed, the word 'smuggling' as used carries with it the implication of knowledge. In Bouvier, vol. 2, p. 528, smuggling is defined: 'The fraudulent taking into a country or out of it merchandise which is lawfully prohibited.' We have, therefore, both the use of a term which implies intentional misconduct and a specific averment that what was done was done willfully, knowingly, and with intent to defraud. * * * An intent to defraud the revenues implies an intent to deprive such revenues of something that is lawfully due them, and there can be no such intent without knowledge of the fact that there is something due. So, when the charge is made that the defendant willfully, unlawfully, and knowingly, and with intent to defraud the revenues of the United States, smuggled and clandestinely introduced into the United States prepared opium, it carries with it a direct averment that he knew that the duties were not fully paid, and that he was seeking to bring such goods into the United States without their just contribution to the revenues. For these reasons, we think that this objection to the indictment also fails."

In Price v. United States, 165 U. S. 311, 17 Sup. Ct. 366, 41 L. Ed. 727, defendant was indicted and convicted for depositing in the mails obscene, lewd, and lascivious matter. The sufficiency of the indictment was attacked upon the ground that there was no direct allegation that the defendant knew that the book that he deposited in the mail was obscene or lewd or lascivious; the only charge being that he knowingly deposited a book, the contents of which were, as a matter of fact, lewd and lascivious, the point being the alleged absence of any charge that he knowingly deposited a book which in fact was obscene, lascivious, and lewd, and which he knew was of that character. The court, through Justice Peckham, held that there was no force in the contention. He said:

"The plain meaning of the indictment is that the defendant deposited in the mail a book which he knew to be obscene, and that in truth it was obscene."

After approving of the decision in Rosen's Case, 161 U. S. 29, 16 Sup. Ct. 434, 40 L. Ed. 606, the court continued:

"In that case we held that the general charge that the defendant unlawfully, willfully, and knowingly deposited and caused to be deposited in the post office a certain obscene, lewd, and lascivious paper, as therein described, might not unreasonably be construed as meaning that the defendant was and must have been aware of the nature of its contents at the time he caused it to be put into the post office for transmission and delivery. Mr. Justice Harlan, in delivering the opinion of the court in that case, said: 'Of course he did not understand the government as claiming that the mere depositing in the post office of an obscene, lewd, and lascivious paper was an offense under the statute, if the person so depositing it had neither knowledge nor notice at the time of its character or contents. He must have understood, from the words of the indictment, that the government imputed to him knowledge or notice of the contents of the paper so deposited. In their ordinary acceptation, the words "unlawfully, willfully, and knowingly," when applied to an act or thing done, import knowledge of the act or thing so done, as well as an evil intent or bad purpose in doing such thing; and, when used in an indictment in connection with the charge of having deposited in the mails an obscene, lewd, and lascivious paper, contrary to the statute in such case made and provided, could not have been construed as applying to the mere depositing in the mail of a paper, the contents of which at the time were wholly unknown to the person depositing it. The case is, therefore, not one of total omission from the indictment of an essential averment, but, at most, one of inaccurate or imperfect statement of a fact; and such statement, after verdict, may be taken in the broadest sense authorized by the words used, even if it be adverse to the accused.' * * *"

Like rulings were made in United States v. Fulkerson (D. C.) 74 Fed. 619; United States v. Nathan (D. C.) 61 Fed. 936; Blake v. United States, 71 Fed. 286, 18 C. C. A. 117.

My conclusion is that, considering all the language of this indictment, while it is not as direct as it might be in form, yet in its substantial averments it is sufficiently clear as against general demurrer, and that it well enough informs the defendants that they are charged with conspiracy to defraud, and with the doing of overt acts to effect the object of the conspiracy. They must therefore plead to the merits.